BC

Judge Mary M. Rowland
Magistrate Judge Maria Valdez
Random Cat 2

RECEIVED
9/23/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

MAN

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

**MELISSA "TOOLEY" POINTER**,
**SCOTT "FORD" DAMNJANOVIC**, and
**CHRISTOPHER MCKINNON**,
Plaintiffs,

v.

**CITY OF MARSEILLES, ILLINOIS**,
**JIM HOLLENBECK, in his official and individual capacity**,
**TODD GORDON, in his official capacity as Chief of Police of Marseilles**, and
**LESLEY HART, in her official and individual capacities as City Clerk of Marseilles**, and
**RANDOLPH GORDON, in his individual capacity as private council for Jim Hollenbeck and Lesley Hart**
Defendants,

Case No. _____

---

# COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)

---

## INTRODUCTION

1. This civil rights action arises from a sustained pattern of harassment, intimidation, and retaliation by Defendants against Plaintiffs, in violation of 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), 42 U.S.C. § 3617, and the Illinois Whistleblower Act, 740 ILCS 174/20.

2. Acting under color of state law, Defendants engaged in conduct that was willful, wanton, and carried out with deliberate indifference and malicious intent, thereby violating Plaintiffs' clearly established constitutional rights under the First and Fourteenth Amendments.

3. Plaintiffs seek redress for these constitutional and statutory violations, as well as supplemental state law claims, and request both compensatory and punitive damages to deter future misconduct and vindicate fundamental rights.

4. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered actual harm, including but not limited to:

    a. Severe emotional distress, anxiety, and fear caused by targeted harassment and retaliation.

    b. Reputational injury resulting from public statements and exclusion from civic forums.

    c. Financial losses, including forced relocation, legal expenses, and disruption of professional activities.

    d. Loss of access to public records and civic participation, impairing Plaintiffs' advocacy efforts.

5. Plaintiffs reserve the right to amend this Complaint to add additional parties and claims as discovery progresses.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights jurisdiction). The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

2. Venue is proper in this District under 28 U.S.C. § 1391 because the events giving rise to this action occurred in Marseilles, Illinois, which lies within the Northern District of Illinois.

## PARTIES

1. **Plaintiff Scott "Ford" Damnjanovic** was a resident of Marseilles, Illinois and Pearce, Arizona at all relevant times. Defendants' conduct chilled his exercise of his First Amendment rights.

2. **Plaintiff Melissa "Tooley" Pointer** was a resident of Marseilles, Illinois and Yorkville, Illinois at all relevant times. Defendants' conduct caused her to refrain from speaking at city meetings for fear of retaliation, thereby chilling her exercise of her First Amendment rights.

3. **Plaintiff Christopher McKinnon** was a resident of Marseilles, Illinois at all relevant times. He was targeted by Defendants' retaliatory actions, including receipt of a cease-and-desist letter from Mayor Hollenbeck's attorney solely because of his public criticism of the Mayor. This threat chilled his exercise of his First Amendment rights.

4. **Defendant City of Marseilles, Illinois** is a municipal corporation organized under Illinois law and is responsible for the actions of its policymakers and officials.

5. **Defendant Jim Hollenbeck** was, at all relevant times, the Mayor of Marseilles and presiding officer of the City Council. He is sued in both his official and individual capacities.

6. **Defendant Todd Gordon** was, at all relevant times, the Chief of Police of Marseilles. Acting under color of state law, he enforced Mayor Hollenbeck's unlawful directive by removing Plaintiff Damnjanovic from a City Council meeting and failed to generate a police report against Defendant Hollenbeck when requested by Plaintiff Pointer. He is sued in both his official and individual capacities.

7. **Defendant Lesley Hart** was, at all relevant times, the duly appointed City Clerk of Marseilles. Acting under color of state law, she knowingly and intentionally denied the existence of public records documenting her own sexual harassment complaint and settlement against Mayor Hollenbeck and the City and assisted in retaliation against Plaintiffs. She is sued in both her official and individual capacities.

8. **Defendant Randolph Gordon** acted in concert with Defendants Hollenbeck and Hart, falsely holding himself out as legal counsel for the City despite lacking such authority. He conspired with Defendants to retaliate against Plaintiffs and suppress their protected speech. He is sued in his individual capacity.

## FACTUAL ALLEGATIONS

1. Plaintiffs Damnjanovic, Pointer, and McKinnon base the following allegations on personal knowledge and retained records, including screenshots, FOIA responses, body camera footage, and contemporaneous notes.

2. On September 6, 2023, Plaintiff McKinnon addressed the Marseilles City Council during its regular public meeting at City Hall.

3. Plaintiff McKinnon questioned the City's plan to purchase property at 200 Riverfront Drive for over $1.3 million, despite the property having been acquired the prior year for roughly half that amount.

4. Plaintiff McKinnon further stated that such a purchase should be subject to a public referendum rather than decided unilaterally by Defendant Hollenbeck.

5. Less than twenty-four hours later, on September 7, 2023, Plaintiff McKinnon received a citation for alleged grass violations, issued in a name that is not legally his.

6. The suspicious timing and irregularity of the citation strongly indicate it was issued in retaliation for Plaintiff McKinnon's protected speech.

7. On November 15, 2023, Plaintiff McKinnon lawfully recorded the City Council's regular public meeting at City Hall after the City had ceased recording its own proceedings.

8. The recording occurred in a public forum where no reasonable expectation of privacy existed.

9. On November 27, 2023, Plaintiff McKinnon received a cease-and-desist letter from Defendant Randolph Gordon, who falsely claimed to represent the City and its employees.

10. The letter mischaracterized Plaintiff McKinnon's lawful recording of a public meeting as "criminal behavior" and "annoying."

11. Defendant Randolph Gordon had no formal authorization to act on behalf of the City.

12. The letter was intended to silence Plaintiff McKinnon and chill his constitutionally protected speech.

13. In early August 2024, Plaintiff Damnjanovic submitted lawful FOIA requests seeking records concerning sexual harassment complaints and settlements involving City officials.

14. Defendant Hart knowingly and willfully concealed responsive records, including her own complaint against Defendant Hollenbeck and the resulting settlement paid with public funds.

15. Acting under color of state law, Defendant Hart falsely denied the existence of such records in written FOIA responses.

16. These records were material to Plaintiff Damnjanovic's investigation into official misconduct, including sexual harassment, abuse of authority, and misuse of taxpayer funds.

17. Defendant Hart's concealment deprived the public of information necessary for oversight and accountability and was deliberate, not inadvertent.

18. This conduct obstructed Plaintiff Damnjanovic's right to petition the government and interfered with his First Amendment activities, including civic engagement and lawful oversight.

19. On August 16, 2024, Plaintiffs Damnjanovic and Pointer received letters from an attorney offering to purchase their homes in Timber Edge Subdivision in anticipation of a planned industrial development.

20. At the August 21, 2024, City Council meeting, Plaintiffs questioned Defendant Hollenbeck about the development, but he denied any knowledge of such plans.

21. At the August 21, 2024, meeting, Plaintiff Damnjanovic disclosed the summary of an HR report secretly provided by Defendant Hart, which led to further harassment.

22. The full HR report, requested via FOIA in August 2024, has never been released despite being funded with taxpayer dollars.

23. In the official City Council newsletter dated August 30, 2024, Defendant Hollenbeck wrote: "*You may or may not be aware that property is being purchased on the south side of the river near the City water tower… At the time of this writing the city hasn't been approached by the developers and therefore we aren't aware of what the plans are. I am sure that soon they will be discussing their intentions with the city. Development in this area could be very beneficial to the city.*"

24. On January 13, 2025, Plaintiff Pointer received a FOIA response containing emails, dating back to August 2023, between Defendants Hollenbeck, Hart, contracted city engineer Mike Etscheid, Finance Commissioner Bobby Kaminski, and representatives of Constellation Energy.

25. These emails demonstrate that the City had knowledge of and was participating in property acquisition discussions a full year before Defendant Hollenbeck's public denial.

26. The emails included purchase negotiations between Constellation Energy and Timber Edge residents, which Constellation representatives had forwarded to Etscheid.

27. Plaintiffs Damnjanovic and Pointer could not identify any legitimate reason for City officials to possess these private negotiations.

28. When confronted with the emails, Defendant Hollenbeck falsely claimed "attorney-client privilege," despite no attorney being involved in or retained for the acquisition, and despite Defendant Hollenbeck not being an attorney.

29. The City withheld material facts from residents while negotiations were ongoing, including payments to the engineering firm invoiced as "assisting Constellation with acquiring property south of the river" as early as May 2024.

30. Plaintiffs received these invoices via FOIA only weeks after the forced sale of their homes in March 2025.

31. On November 20, 2024, Plaintiff Damnjanovic attended the regular City Council meeting intending to speak critically about City officials, including the concealed sexual harassment complaint and settlement involving Defendants Hart and Hollenbeck.

32. Before the meeting began, Defendant Hollenbeck approached Chief of Police, Defendant Todd Gordon, and together they confronted Plaintiff Damnjanovic.

33. Defendant Hollenbeck told Plaintiff Damnjanovic, "*You are shut down and not allowed to speak*," and directed Defendant Todd Gordon to remove him.

34. Acting on Defendant Hollenbeck's unlawful order, Defendant Todd Gordon escorted Plaintiff Damnjanovic out of City Hall, preventing him from participating in the meeting.

35. Plaintiff Damnjanovic was removed before the public comment period began and before he had any opportunity to speak on matters of public concern.

36. Plaintiff Damnjanovic was not disruptive, had not violated any procedural rules, and had not exceeded any time limit, as the meeting had not yet started.

37. Commissioners Melissa Small and Michael Scheib personally witnessed Defendant Hollenbeck's directive and Defendant Todd Gordon's enforcement.

38. On November 8, 2024, Defendants exchanged internal emails planning Plaintiff Damnjanovic's removal from a City Council meeting, demonstrating that the action was deliberate and not spontaneous.

39. On or about December 20, 2024, Defendant Hollenbeck, using his official "Mayor of Marseilles" government email account, contacted the LaSalle County State's Attorney's Office.

40. In that email, Defendant Hollenbeck inquired about a pending traffic case involving Plaintiff Damnjanovic for allegedly driving on a suspended license.

41. Defendant Hollenbeck further requested information regarding the status of Plaintiff Damnjanovic's Illinois driver's license, seeking non-public, private DMV/driver data.

42. In the same communication, Defendant Hollenbeck disparaged Plaintiff Damnjanovic, stating that he attended City Council meetings to "harass," and suggested that he drove to such meetings "on a suspended license," asking rhetorically "how you get here."

43. At no time was Plaintiff Damnjanovic's driver's license suspended.

44. Defendant Hollenbeck's inquiry was not made for any legitimate governmental purpose, but rather to retaliate against Plaintiff Damnjanovic's exercise of his First Amendment rights to speak critically at City Council meetings.

45. By using his official mayoral position and email account to solicit Plaintiff Damnjanovic's protected motor vehicle records, Defendant Hollenbeck violated Plaintiff Damnjanovic's rights under the Driver's Privacy Protection Act (DPPA), 18 U.S.C. § 2721 et seq., which prohibits obtaining, using, or disclosing a motor vehicle record for unauthorized purposes.

46. Defendant Hollenbeck's actions were willful, intentional, and malicious, designed to harass Plaintiff Damnjanovic and chill his speech.

47. Defendant City of Marseilles is liable under *Monell* because Defendant Hollenbeck was acting as a final policymaker for the City in his official capacity.

48. On December 22, 2024, Plaintiff Pointer posted a comment on the official City of Marseilles Facebook page regarding the quality of the municipal water supply.

49. Plaintiff Pointer's comments were critical of the water quality coming from her faucets.

50. In response, Defendant Hollenbeck, acting in his official capacity and using the official City Facebook account, attempted to publish Plaintiff Pointer's private details. These details were obtained from county systems and were posted with the intent to discredit her and cause reasonable fear for her safety.

51. Plaintiff Pointer uses her maiden name, Tooley, as an alias on social media to protect her safety and privacy.

52. Plaintiff Pointer informed Defendant Hollenbeck that the information he posted was inaccurate. In reply, Defendant Hollenbeck demanded that she publicly disclose her real name and residential address.

53. Plaintiff Pointer refused to provide her private information in a public forum. Shortly thereafter, Defendant Hollenbeck suspended the official City of Marseilles Facebook page.

54. On December 25, 2024, Defendant Hollenbeck reactivated the official City Facebook page but restricted public participation by limiting comments to only those residents who did not oppose him.

55. This conduct was retaliatory, intended to silence protected speech, and deprived Plaintiff Pointer of equal access to a designated public forum.

56. Plaintiff Pointer later attempted to speak during the public comment portion of a City Council meeting regarding property acquisitions in her neighborhood, Timber Edge.

57. Defendant Hollenbeck interrupted her and stated that she was prohibited from discussing Timber Edge because another resident had already spoken on the subject.

58. Defendant Hollenbeck further threatened Plaintiff Pointer with removal if she continued and warned all attendees that anyone else who spoke on the subject would face removal and possible disorderly conduct charges.

59. Out of fear of arrest, Plaintiff Pointer refrained from speaking about Timber Edge and limited her comments to water quality.

60. Between January 2 and January 15, 2025, Defendant Hollenbeck drove through Plaintiffs' subdivision on multiple occasions.

61. During this time, Defendant Hollenbeck made threatening statements directed at Plaintiffs, including that he would take Plaintiff Pointer's home if she did not stop "causing him problems," and that "the police would be of no help."

62. As a direct result of these threats and intimidation, Plaintiffs refrained from speaking at subsequent council meetings out of fear of retaliation.

63. Plaintiffs Damnjanovic and Pointer remained residents of Marseilles until March 2025, when they sold their homes to representatives of Constellation Energy.

64. Plaintiffs' decision to sell was made under duress after months of intimidation, including the presence of boarded-up vacant houses surrounding their properties, daily operation of heavy equipment tearing up utilities near their homes, and repeated slow drive-byes from Defendant Hollenbeck.

65. On the morning of March 3, 2025, while Plaintiff Pointer was preparing for her closing, her household water service was abruptly shut off.

66. Plaintiff Pointer had not scheduled a water disconnect, nor had she authorized anyone else to do so.

67. Plaintiff Pointer had secured post-closing possession of the property and required continued utility service during her move.

68. Later that day, Plaintiff Pointer posted on the citizen-run Marseilles Town Forum regarding the water shutoff and criticized City officials for their handling of the matter.

69. Acting in his official capacity as Mayor, Defendant Hollenbeck took screenshots of Plaintiff Pointer's post and published them on his official Mayor Facebook page with defamatory comments.

70. Defendant Hollenbeck falsely accused Plaintiff Pointer of lying and publicly disclosed her legal name alongside her Facebook alias.

71. Plaintiff Pointer was blocked from commenting on Defendant Hollenbeck's official post to clear her name.

72. On March 9, 2025, Defendant Hollenbeck again published defamatory statements about Plaintiff Pointer on his official Mayor Facebook page, again using both her legal name and alias.

73. When Plaintiff Pointer requested removal of the false statements and her legal name, Defendant Hollenbeck blocked her from viewing or responding to his official page.

74. As of the date of this filing, Plaintiffs Pointer and Damnjanovic remain blocked from Defendant Hollenbeck's official Mayor page.

75. Between March 9 and April 15, 2025, Defendant Hollenbeck drove to Plaintiff Pointer's new residence in Yorkville, Illinois, located at the end of a dead-end road, on at least three separate occasions, furthering a pattern of intimidation and harassment.

76. On March 16, 2025, Plaintiffs received records in response to a FOIA request. These records included invoices, dating back to March 2024, from the City's contracted engineer for "assisting Constellation with acquisition of properties south of the river." The invoices were approved for payment with taxpayer funds by Defendant Hollenbeck and Commissioner Kaminski.

77. The FOIA records revealed that Defendant Hollenbeck had knowingly misrepresented the City's role in the property acquisitions.

78. While publicly denying any City involvement, Defendant Hollenbeck authorized the use of taxpayer funds to assist Constellation in acquiring properties, thereby misleading Plaintiffs and abusing his official position.

79. On April 18, 2025, Defendant Hollenbeck posted on his official Mayor Facebook page, and the City of Marseilles website, that he had received numerous complaints regarding online harassment and bullying and urged residents to report such incidents to the police.

80. That same day, Defendant Hollenbeck sent a friend request to Plaintiff Pointer's elderly mother, who resides in Kentucky, has never been to Marseilles, and has never met Defendant Hollenbeck.

81. This action caused Plaintiff Pointer renewed fear for her safety. She sought an order of protection but later withdrew the case for personal reasons.

82. On April 22, 2025, a complaint was filed with Marseilles Police accusing Plaintiff Damnjanovic of harassment. The complainant alleged that on April 20, 2025, Plaintiff Damnjanovic stood on a sidewalk taking photographs of a residence during an Easter gathering.

83. The complainant further alleged that Plaintiff Damnjanovic departed in a 2012 Transit van bearing his business name and logo. Police declined to pursue charges after FLOCK camera data showed no evidence of Plaintiff Damnjanovic in the area during the prior 30 days.

84. In fact, Plaintiff Damnjanovic had sold the 2012 Transit van in January 2025 and was in Arizona with his family on April 20, 2025, making the allegations impossible.

85. On or about June 20, 2025, Defendant Hollenbeck, acting as a moderator of the citizen-run "Marseilles Town Forum (Original)" Facebook page, blocked Plaintiff Damnjanovic from participating without cause or warning.

86. The "Marseilles Town Forum (Original)" page functions as a public forum for civic discourse, community updates, and political discussion relevant to Marseilles residents.

87. Defendant Hollenbeck's unilateral decision to block Plaintiff Damnjanovic was motivated by personal animus and disagreement with his protected speech, and was made without notice, explanation, or opportunity to appeal.

88. Following this incident, the page administrator removed Defendant Hollenbeck from his moderator role and reinstated Plaintiff Damnjanovic's access.

89. After his removal, Defendant Hollenbeck sent a series of messages to the administrator containing derogatory statements about Plaintiffs Damnjanovic and Pointer, and threatening defamation lawsuits if they continued to criticize him.

90. Concerned by the tone and content of these messages, the administrator shared them with Plaintiff Pointer.

91. At present, Defendants Hollenbeck and Hart are suing a City Commissioner and the City of Marseilles, through Defendant Randolph Gordon, based on a statement of opinion made by the Commissioner on his personal Facebook page.

92. On June 24, 2025, Plaintiff Pointer accessed the City's official YouTube channel to review recent City Council meeting recordings in preparation for this filing.

93. While she was actively viewing one such video, the recording and other recent meeting videos were removed from public access.

94. On June 26, 2025, Plaintiff Pointer submitted a FOIA request to Defendant Hart, the City's FOIA officer, specifically identifying the missing video by hyperlink.

95. Less than three hours later, Defendant Hart denied the request, claiming "no records exist."

96. At the time of denial, the requested records did exist and had been publicly available only days earlier.

97. On July 2, 2025, the City Attorney informed Plaintiffs that the videos had been "suddenly found" by the City's IT department.

98. The removal of the videos, Defendant Hart's denial, and the subsequent "rediscovery" demonstrate that the records existed at all relevant times and were improperly withheld.

99. On July 16, 2025, following a City Council meeting, Plaintiff Pointer approached Defendant Todd Gordon to request the filing of a criminal complaint against Defendant Hollenbeck.

100. Plaintiff Pointer reported that Defendant Hollenbeck had unlawfully recorded and disseminated her private telephone conversation with Commissioner Michael Scheib.

101. Plaintiff Pointer learned of this recording when the administrator of the "Marseilles Town Forum (Original)" shared text messages authored by Defendant Hollenbeck.

102. In those messages, Defendant Hollenbeck wrote: "I have proof of Scheib talking on the phone to Melissa Tooley and telling her to post on the forums information regarding the water that had absolutely nothing to do with our water and testing procedures they were from a private lab not even associated with the city in any way."

103. The referenced call was a private conversation between Plaintiff Pointer and Scheib, conducted on Scheib's personal cell phone, regarding water test results from an EPA-approved lab.

104. Scheib participated in the call in his individual capacity as Plaintiff Pointer's friend, not in his official capacity as a City Commissioner.

105. Neither Plaintiff Pointer nor Scheib consented to the interception, recording, or dissemination of their call.

106. Plaintiff Pointer relayed this information to Defendant Todd Gordon and Captain Buckingham on police body-worn camera and requested a report.

107. Defendant Todd Gordon stated that no crime had occurred and declined to initiate a report.

108. Captain Buckingham indicated he would forward the matter to the State's Attorney.

109. Several days later, Buckingham informed Plaintiff Pointer that the State's Attorney had declined prosecution.

110. Plaintiff Pointer then requested a copy of the police report documenting her complaint.

111. She was informed that no report had been created, although the body-worn camera footage of her interview was retained.

112. On July 16, 2025, Plaintiff Pointer received photos in response to a FOIA request submitted June 18, 2025, regarding the suspension of the official City Facebook page on December 22, 2025.

113. The photos depicted vulgar handwritten statements on the walls inside Plaintiff Pointer's former home, which she had sold under duress in March 2025.

114. These statements were not present when Plaintiff Pointer last occupied the home.

115. Plaintiff Pointer emailed Defendant Hart and the City attorneys seeking clarification as to why these images were produced and how they related to her FOIA request.

116. The City attorney responded that Defendant Hart had misunderstood the request and that the photos were located on Defendant Hollenbeck's City-issued phone.

117. The attorney further stated that the photos had been sent to Defendant Hollenbeck by contractors hired by Constellation Energy to demolish homes in Timber Edge.

118. Plaintiff Pointer contacted her Constellation representative, who denied any knowledge of the photos or the vulgar statements.

119. On July 31, 2025, the City attorney provided a different explanation, stating that a public works employee removing the water meter had taken the photos inside the home and sent them to Defendant Hollenbeck on March 11, 2025.

120. Plaintiff Pointer retained possession of the residence until March 13, 2025, and had not authorized entry into the home.

121. The water meter was located outside the home, and there was no legitimate reason for public works personnel to enter the interior or take photographs.

122. Plaintiffs Damnjanovic, Pointer, and McKinnon have endured ongoing harassment, intimidation, and reputational harm from Defendants in both their official and personal capacities.

123. Plaintiffs have suffered emotional distress, humiliation, financial loss, and a chilling effect on their future participation in civic affairs.

**CAUSE OF ACTION**

## Count I – First Amendment Violations and Retaliation (42 U.S.C. § 1983)

1. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 123 as though fully set forth herein.
2. Defendant Hollenbeck acted under color of law with the intent to silence Plaintiffs' protected speech.
3. Defendant Hollenbeck used the official City of Marseilles and Mayor Facebook pages to publish defamatory statements, block critics, and restrict access. These pages were used to communicate official city matters, thereby satisfying both prongs of the test set forth in *Lindke v. Freed*, 601 U.S. 187 (2024).
4. By suspending the page and later restricting comments to only supporters, Defendant Hollenbeck engaged in unconstitutional viewpoint discrimination.
5. The City of Marseilles Facebook page and council meetings are designated public forums. Defendant Hollenbeck's selective restrictions and threats of removal for discussing Timber Edge violate the standards articulated in *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983), and *City of Madison Joint School District v. Wisconsin PERC*, 429 U.S. 167 (1976).
6. Defendant Hollenbeck's persistent use of official social media to retaliate, intimidate, and publish private information establishes a "custom" of unconstitutional conduct constituting state action under *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).
7. Plaintiffs Damnjanovic, Pointer, and McKinnon engaged in constitutionally protected speech by speaking critically at public meetings, submitting FOIA requests, and recording public proceedings.
8. The retaliatory issuance of citations, cease-and-desist letters, removal from meetings, and blocking from public forums constitute adverse actions intended to chill speech, in violation of *Hartman v. Moore*, 547 U.S. 250 (2006), *Fairley v. Andrews*, 578 F.3d 518 (7th Cir. 2009), and *Surita v. Hyde*, 665 F.3d 860 (7th Cir. 2011).
9. Defendants' actions constitute content-based and viewpoint discrimination forbidden by *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), and retaliatory enforcement actions prohibited under *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019).
10. As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs suffered injury to their constitutional rights, emotional distress, reputational harm, and other damages.

## Count II – Fourteenth Amendment Due Process Violation (42 U.S.C. § 1983)

1. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 123 as though fully set forth herein.
2. Defendants deprived Plaintiffs of liberty and property interests without due process of law, in violation of the Fourteenth Amendment.

3. Plaintiff Pointer reported Defendant Hollenbeck's unlawful recording to Defendant Todd Gordon and Captain Buckingham, requesting that a police report be filed.

4. Defendant Gordon refused to initiate a report, stating no crime had occurred. Captain Buckingham later informed Plaintiff Pointer that the State's Attorney declined prosecution.

5. Plaintiff Pointer subsequently requested a copy of the police report documenting her complaint and was informed that no report had been created, despite the existence of body-worn camera footage documenting her request.

6. The refusal to generate a police report deprived Plaintiff Pointer of a documented record of her complaint, obstructed her ability to seek redress, and constituted arbitrary and capricious conduct under color of state law.

7. Such conduct violates the procedural due process protections recognized in *Mathews v. Eldridge*, 424 U.S. 319 (1976), and constitutes state action under *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).

8. As a direct and proximate result of Defendants' actions, Plaintiffs suffered injury to their constitutional rights, loss of access to official records, and other damages.

## Count III – Conspiracy to Interfere with Civil Rights (42 U.S.C. § 1985(3))

1. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 123 as though fully set forth herein.

2. Defendants, acting in concert, entered into an agreement and understanding to intimidate, retaliate against, and otherwise interfere with Plaintiffs' exercise of their constitutional rights, including their rights under the First and Fourteenth Amendments.

3. Specifically, Defendants conspired to:

    a. Suppress Plaintiffs' protected speech and civic participation by unlawfully intercepting private communications;

    b. Deny access to public records and obstruct FOIA requests;

    c. Retaliate against Plaintiffs for speaking out in citizen forums and criticizing city officials.

4. Section 1985(3) provides a cause of action where "two or more persons… conspire… for the purpose of depriving… any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3).

5. Courts have recognized that conspiracies to retaliate against individuals for exercising First Amendment rights may fall within the scope of § 1985(3) when motivated by retaliatory animus. See *Kush v. Rutledge*, 460 U.S. 719 (1983).

6. Here, Defendants coordinated actions—including the unlawful interception of communications, refusal to document Plaintiff Pointer's criminal complaint, dissemination of unauthorized photographs, solicitation of harassment complaints against Plaintiffs, and shifting explanations designed to conceal misconduct—which constitute

overt acts in furtherance of a conspiracy to chill Plaintiffs' protected speech, obstruct their civic advocacy, and deprive them of equal protection of the laws.

7. As a direct and proximate result of Defendants' conspiracy, Plaintiffs suffered injury to their constitutional rights, emotional distress, reputational harm, and loss of security in their home and community.

## Count IV – Retaliation Under the Fair Housing Act (42 U.S.C. § 3617)

1. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 123 as though fully set forth herein.
2. Defendants interfered with Plaintiffs' housing rights through actions, threats, and intimidation.
3. Section 3617 of the Fair Housing Act makes it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, any right granted or protected by the Act.
4. Plaintiffs Damnjanovic and Pointer were entitled to the right to purchase, occupy, and enjoy their homes in the Timber Edge Subdivision free from interference, intimidation, or retaliation.
5. Defendant Hollenbeck, acting under color of law and in his official capacity as Mayor of Marseilles, engaged in a pattern of threats, intimidation, and harassment directed at Plaintiffs, including:
    a. Driving repeatedly through Plaintiffs' subdivision and making threatening statements such as that he would "take Plaintiff Pointer's home" if she did not stop causing him problems;
    b. Warning that "the police would be of no help" if Plaintiffs continued to speak out;
    c. Orchestrating or permitting the shutoff of Plaintiff Pointer's water service on the morning of her property closing;
    d. Publicly defaming Plaintiffs Damnjanovic and Pointer on the official Mayor Facebook page, disclosing Plaintiff Pointer's legal name, and blocking her from responding;
    e. Threatening removal and possible criminal charges if Plaintiffs attempted to speak about Timber Edge during public comment at City Council meetings.
6. These actions were intended to, and did, interfere with Plaintiffs' ability to exercise their housing rights, including their right to remain in and enjoy their homes without coercion or intimidation.
7. As a direct and proximate result of Defendant's conduct, Plaintiffs were forced to sell their homes under duress, suffered economic losses, emotional distress, and were deprived of their rights under the Fair Housing Act.

## Count V – Fourth Amendment Violation / Trespass (42 U.S.C. § 1983)

1. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 123 as though fully set forth herein.

2. Defendants perpetuated unlawful entry into Plaintiff Pointer's home through public works employees and obtained photographs.

3. Plaintiff Pointer had a clearly established constitutional right to be free from warrantless and unauthorized entry into her home.

4. Defendants, acting under color of state law, caused or directed public works employees to unlawfully enter Plaintiff Pointer's home without a warrant, consent, or exigent circumstances.

5. This entry constituted both a trespass under Illinois law and an unreasonable search under the Fourth Amendment.

6. Defendants' conduct was deliberate and intended to intimidate Plaintiff Pointer, interfere with her privacy, and retaliate against her for her protected speech and civic advocacy.

7. As a direct and proximate result of Defendants' unlawful entry, Plaintiff Pointer suffered:

    a. Violation of her constitutional right to privacy and security in her home;

    b. Emotional distress, fear, and anxiety caused by the trespass;

    c. Loss of sense of safety and security in her residence; and

    d. Other damages to be proven at trial.

8. No legitimate governmental interest justified the intrusion, and the entry was unrelated to any lawful public works function as the meter being disconnected was outside.

9. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

10. A warrantless physical entry into a person's home is presumptively unreasonable and unconstitutional absent exigent circumstances or valid consent. See *Payton v. New York*, 445 U.S. 573, 586 (1980).

11. Even a minimal physical intrusion into the home or its curtilage by government officials constitutes a "search" under the Fourth Amendment. See *Florida v. Jardines*, 569 U.S. 1, 6 (2013).

12. Municipal officials and employees, including public works staff, act under color of state law when performing their duties, and municipalities may be liable under § 1983 where the violation results from official policy, practice, or the direction of policymakers. See *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690–91 (1978).

## Count VI – Petition Clause / Chilling Effect (42 U.S.C. § 1983)

1. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 123 as though fully set forth herein.

2. The First Amendment protects not only the right to free speech but also the right "to petition the Government for a redress of grievances." U.S. Const. amend. I.

3. Government officials may not take retaliatory actions intended to deter or chill individuals from exercising their right to petition or engage in civic advocacy. See *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 524–25 (2002); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

4. A plaintiff states a claim for Petition Clause retaliation by showing: (a) she engaged in protected petitioning activity; (b) defendants took adverse action against her that would deter a person of ordinary firmness from continuing to petition; and (c) the adverse action was motivated by her protected activity. See *Surita v. Hyde*, 665 F.3d 860, 874 (7th Cir. 2011); *Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012).

5. Plaintiffs engaged in protected petitioning activity by filing FOIA requests, preparing complaints, speaking at council meetings, and communicating with journalists and advocacy groups regarding public corruption.

6. Defendants deliberately sought to chill this protected activity by producing and disseminating irrelevant, inflammatory photographs to Plaintiff Pointer, with the intent to intimidate her and deter her from continuing her civic advocacy.

7. Defendants' conduct was calculated to create fear, reputational harm, and emotional distress, thereby discouraging Plaintiffs from exercising their constitutional rights.

8. These actions would deter a person of ordinary firmness from continuing to file FOIA requests, attend council meetings, or pursue legal remedies against government misconduct.

9. The timing and nature of Defendants' actions demonstrate that Plaintiffs' protected petitioning activity was a substantial or motivating factor in Defendants' retaliatory conduct.

## Count VII – Driver's Privacy Protection Act (DPPA) Violations

1. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 123 as though fully set forth herein.

2. Defendant Hollenbeck's use of his official mayoral email to solicit Plaintiff Damnjanovic's private DMV records, without a legitimate governmental purpose, constitutes a willful violation of the DPPA.

3. In *Maracich v. Spears*, 570 U.S. 48 (2013), the Supreme Court held that the DPPA prohibits use of DMV records for unauthorized purposes, including political retaliation.

4. In *Taylor v. City of Saginaw*, 922 F.3d 328 (6th Cir. 2019), the court affirmed that misuse of vehicle data implicates both privacy and constitutional protections.

5. As a direct and proximate result of Defendant's conduct, Plaintiffs suffered injury to their privacy rights, emotional distress, and other damages.

## Count VIII – Monell Liability

1. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 123 as though fully set forth herein.
2. Defendant City of Marseilles is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because Defendant Hollenbeck acted as a final policymaker in issuing retaliatory directives, soliciting private data, and obstructing public participation.
3. In *McTigue v. City of Chicago*, 60 F.3d 381 (7th Cir. 1995), the Seventh Circuit held that mayoral actions taken in an official capacity can constitute municipal policy.
4. In *Glisson v. Indiana Department of Corrections*, 849 F.3d 372 (7th Cir. 2017), the court recognized that a pattern of constitutional violations and deliberate indifference supports Monell liability.
5. The City of Marseilles, through its policymakers, ratified, condoned, or was deliberately indifferent to the unconstitutional conduct alleged herein, thereby rendering the municipality liable under § 1983.

## Count IX – FOIA Violations and Concealment of Public Records

1. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 123 as though fully set forth herein.
2. Plaintiffs Damnjanovic and Pointer submitted lawful FOIA requests seeking records of public concern.
3. Defendant Hart deliberately concealed responsive documents, including sexual harassment settlements paid with public funds, in violation of both federal and Illinois FOIA law.
4. In *Milner v. Department of the Navy*, 562 U.S. 562 (2011), the Supreme Court emphasized that FOIA exemptions must be narrowly construed to protect the public's right of access.
5. Illinois courts have likewise held that settlement agreements involving public funds are subject to disclosure. See *Watkins v. McCarthy*, 2016 IL App (1st) 150422.
6. In *Chicago Tribune Co. v. College of DuPage*, 2017 IL App (2d) 160274, the court affirmed that FOIA applies to communications revealing public agency dealings.
7. The Seventh Circuit has recognized that obstructing access to public records can violate the First Amendment right to petition. See *Gekas v. Williamson*, 793 F.3d 904 (7th Cir. 2015).
8. As a direct and proximate result of Defendant Hart's concealment, Plaintiffs were deprived of access to public records, obstructed in their civic advocacy, and suffered injury to their constitutional and statutory rights.

## Count X – Defamation, Harassment, and Intentional Infliction of Emotional Distress (Illinois Common Law)

1. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 123 as though fully set forth herein.
2. Defendant Hollenbeck published false statements of fact about Plaintiff Pointer on his official Mayor Facebook page, including accusations that she was lying regarding the water shutoff.
3. These statements were published to third parties and were reasonably understood to concern Plaintiff Pointer.
4. The statements were false, defamatory per se, and caused reputational harm by imputing dishonesty and lack of integrity.
5. Defendant Hollenbeck acted with actual malice, or at minimum negligence, in publishing these statements, as he knew or should have known they were false. See *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); *Hadley v. Doe*, 2015 IL 118000.
6. Illinois law recognizes defamation per se where statements impute dishonesty or lack of integrity in one's profession or public role.
7. Defendant's conduct was extreme and outrageous, and as a direct and proximate result, Plaintiffs suffered:
    a. Loss of access to a public forum for civic participation;
    b. Reputational harm from false accusations;
    c. Emotional distress and fear for personal safety; and
    d. Chilling of their willingness to engage in protected speech.

## Count XI – Retaliation Under the Illinois Whistleblower Act (740 ILCS 174/)

1. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 123 as though fully set forth herein.
2. Defendants retaliated against Plaintiffs for disclosing information about public corruption.
3. Plaintiffs disclosed information regarding misuse of public funds, suppression of public records, and other acts of public corruption by City officials to government agencies, attorneys, and journalists.
4. Plaintiffs reasonably believed that the conduct they disclosed constituted violations of Illinois law, including the Illinois Freedom of Information Act (5 ILCS 140/), misuse of municipal resources, and violations of constitutional rights.
5. In retaliation for these disclosures, Defendants engaged in adverse actions against Plaintiffs, including:
    a. Publicly associating Plaintiffs with false allegations of harassment;

b. Blocking Plaintiffs from participating in civic forums;

c. Threatening defamation lawsuits to chill their speech;

d. Withholding and denying access to public records; and

e. Engaging in intimidation tactics designed to deter further disclosures.

6. These retaliatory actions were causally connected to Plaintiffs' protected disclosures, as evidenced by the timing of the retaliation, the content of Defendants' communications, and Defendants' explicit references to Plaintiffs' criticisms and disclosures.

## Count XII – Abuse of Office / Misuse of Public Funds (Illinois Taxpayer Standing)

1. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 123 as though fully set forth herein.

2. FOIA records revealed that Defendant Hollenbeck authorized taxpayer funds to pay city engineers for "assisting Constellation with acquisition of properties south of the river," while publicly denying City involvement.

3. Defendant's actions constitute an unlawful use of public funds for private corporate benefit, in violation of his fiduciary duty to taxpayers.

4. Plaintiffs, as taxpayers, have standing to enjoin and seek redress for the misappropriation of public funds. See *Paepcke v. Public Building Comm'n of Chicago*, 46 Ill. 2d 330 (1970).

5. Illinois courts have affirmed taxpayers' equitable right to stop illegal use of funds. See *Goldwater Inst. v. Illinois*.

6. Federal law likewise prohibits misuse of federal funds by local officials. See 18 U.S.C. § 666.

7. As a direct and proximate result of Defendant's unlawful expenditures, Plaintiffs and other taxpayers suffered injury through the diversion of public resources for private benefit.

## Count XIII – Violation of the Illinois Eavesdropping Act (720 ILCS 5/14-2)

1. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 123 as though fully set forth herein.

2. The Illinois Eavesdropping Act provides that a person commits eavesdropping when he or she knowingly and intentionally uses an eavesdropping device to record, overhear, or transmit any part of a private conversation without the consent of all parties. 720 ILCS 5/14-2(a)(1).

3. Illinois courts have consistently recognized that the statute protects the privacy of telephone conversations. See *People v. Clark*, 2014 IL 115776.

4. Defendant Hollenbeck knowingly and intentionally intercepted Plaintiff Pointer's private communications without her consent.

5. Defendant's conduct violated Plaintiff's statutory right to be free from unlawful interception of her private communications.

6. As a direct and proximate result, Plaintiff suffered harm including invasion of privacy, reputational injury, and emotional distress.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Declare that Defendants' actions violated Plaintiffs' constitutional rights;

2. Enter an injunction prohibiting Defendants from restricting public comment at City Council meetings based on viewpoint or content;

3. Award Plaintiffs compensatory damages in an amount to be proven at trial;

4. Award punitive damages against Defendant City of Marseilles, Illinois, as well as Defendant's Hollenbeck and Hart in their official capacity in the amount of Three Million Dollars ($3,000,000) for each Plaintiff;

5. Award punitive damages against Defendant Jim Hollenbeck in his individual capacity in the amount of One Million Dollars ($1,000,000) for each plaintiff;

6. Award punitive damages against Defendant Todd Gordon in his official capacity in the amount of One Million Dollars ($1,000,000) for each plaintiff;

7. Award punitive damages against Defendant Lesley Hart in her individual capacity in the amount of One Million Dollars ($1,000,000) for each plaintiff;

8. Award punitive damages against Defendant Randolph Gordon in his individual capacity in the amount of One Million Dollars ($1,000,000) for each plaintiff;

9. Award Plaintiffs reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988;

10. Grant such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand trial by jury on all issues so triable.

**Respectfully submitted,**

Date: Sept 22, 2025

Signature: *M-Pointer*
Melissa "Tooley" Pointer
Yorkville, IL 60560

Signature: *scott damnjanovic (Sep 23, 2025 05:23:02 PDT)*
Scott "Ford" Damnjanovic
Pearce, AZ 85625

Signature: *Christopher McKinnon (Sep 22, 2025 19:55:22 CDT)*
Christopher McKinnon
Marseilles, IL 61341